THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEVESTER BELL *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 83—1642, 83—1735 cons.

Opinion filed March 22, 1985.

PINCHAM, J., dissenting.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Mark L. Lefevour, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE MEJDA delivered the opinion of the court:

Following a bench trial, defendant, Sherman Gibson, also known as Sherman L. Morris, was sentenced to concurrent terms of 10 years for rape, 10 years for deviate sexual assault, four years for robbery, and four years for attempted deviate sexual assault; defendant Levester Bell was sentenced to concurrent terms of seven years for rape, seven years for deviate sexual assault, three years for robbery, and three years for attempted deviate sexual assault. Defendants filed separate appeals which have been consolidated.

Defendants in a joint brief contend (1) they were denied their constitutional right to confront the victim, the complaining witness, by admitting her preliminary hearing testimony into evidence in the trial; and (2) the trial court erred in allowing the arresting officer to testify as to the defendants' out-of-court identification by the victim. We affirm.

The preliminary hearing was held on July 1, 1982, at which the victim was the only witness to testify. On direct examination she stated that she was 24 years old and that on June 30, 1982, at 3:15 a.m. she was walking on Halsted Street when two men, whom she identified in open court as defendants, grabbed her arms from behind. They took her to a school park at 52d Street and Lowe Street, where each defendant committed acts of vaginal and anal intercourse and one of the defendants unsuccessfully demanded oral sex. Defendant Gibson took $4 from her coat pocket, took a blue bag from her into which he deposited some barbecued ribs, and took her Avon kit.

On cross-examination, she stated that it was dark at the time of the attack, but that she could see her assailants' faces because "they had lights around the park though. I could see their faces, you see, good." She testified that she did not know what street the school park was on because she does not read very well and cannot read a street sign; further, that she can read "[o]nly little words that I understand like, dog, cat and things like that." She was asked whether she had attended school and whether she had attended any special classes. The prosecutor's objections to both questions were sustained. She testified that she did not know how long it took to reach the park, but that she could tell time. She did not scream when they first grabbed her, but did start screaming and kicking "when they did it to me ***." She did not see a gun or a knife during the attack and neither defendant hit her, but defendant Gibson did pull her hair. She looked at them for a long time when they first grabbed her and when they were walking to the park. Gibson was the one who pulled off her pants and underwear. She tried to hit and scratch them but could not because they were holding her arms.

She stated that the State's Attorney had told her to use the word "anus" in describing the attack and she admitted that she did not really know what the word meant. She stated that she had used the word "vagina" and that the State's Attorney had not told her to use it.

Defendants' attorney cross-examined the witness concerning her identification of defendants to a police officer. The following colloquy ensued:

"Q. Did you point to two other men and tell the police that they were the men who had did [*sic*] this to you?

A. Just them. (indicating).

\* \* \*

Q. You never told any police officers that two other men were the ones had done this to you?

A. Just them two. I said, not them other two, just them two there. (indicating defendants).

Q. When you were with the police, did you point to two other men, not these men, and tell the police these were the ones?

A. No just them two I pointed to."

At the conclusion of the preliminary hearing, the court found probable cause as to each defendant. An information was thereafter filed and the subsequent proceedings were held before a different judge.

Prior to trial, the prosecution initially moved to use the preliminary hearing testimony of the victim as substantive evidence on the ground that she had died of natural causes on April 10, 1983, since the preliminary hearing. Defendants moved *in limine* to exclude the transcript from evidence. At the hearing, on the motions, defendants presented documents from the Board of Education, Department of Mentally Handicapped, which indicated that the victim was "mentally restricted," with an intelligence quotient measured at various times as between 62 and 83, and that her later scores may have been inflated due to the many times which she had taken the test. After specifically finding that the victim was competent to testify based on her detailed answers to questions, her consistent recall, and her mental and chronological ages, and also had been adequately cross-examined by defendants' counsel, the trial court then granted the State's motion that the preliminary hearing testimony be used at trial and denied defendants' motion that it be excluded.

Defendants thereafter waived jury trials, and the cause proceeded as a bench trial. The State presented the transcript of the victim's testimony at the preliminary hearing which was admitted into evidence over defendants' objections. By agreement, defendants reserved the right to subsequently move to strike the preliminary hearing testimony based on the competency of the victim. Testimony of other witnesses was presented.

Officer Frank Sarabia testified. He and his partner, William Van Vranken, were on duty in their patrol car about 3:20 a.m. on June 30, 1982, when they heard a woman, the victim herein, screaming. She told the officers that she had just been raped in a park at 52d and

Lowe streets by two men and had been robbed of four or five dollars and a blue bag with Avon products in it. She described one of the men as a tall black man, dark complexion, wearing a maroon jacket, gray slacks, and a hairnet. She added that this assailant was taller than Van Vranken, who was 5 feet 8 or 9 inches tall. The victim described the second offender as a black man, about Van Vranken's height but with a heavy build, wearing a black jacket which she described as "neat looking," Levis, and a shirt. The officers put out a "flash message" over the radio to other police cars in the vicinity and then began to tour the area with the victim. The police stopped two black males at Garfield Boulevard and Peoria Street, but the victim immediately stated that they were not the offenders. The police continued their search and stopped two more black males at Garfield and Green streets. One of the men had a blue bag in his hand. When the car was about 20 to 30 feet from the men, the victim said, "Those are the two men that raped me." One of the two men attempted to flee, but stopped when he was warned that he would be shot. The officer then identified defendant Bell as the man in the maroon jacket and defendant Gibson as the man who had been carrying the blue bag. The bag at the time of the arrest only contained some barbecued ribs. The officer took the bag and, without showing it to the victim, asked if there was anything about her bag which she could identify. She said that it was a Woolworth's bag. The officer checked the bag taken from Gibson and verified that it was a Woolworth's bag. At the time of their arrests, Gibson was wearing a "neat" black jacket and Bell was wearing a maroon jacket. Bell had five $1 bills on his person.

On cross-examination, the witness admitted that his police report indicated that the defendants had not resisted arrest and that the flash message stated only that the offenders were two black males, one wearing a black suit coat and one wearing a longish jacket. The report contained no information concerning the offenders' ages, heights, builds or complexions, nor mentioned either a hairnet or a blue bag.

Dorthea Parker, the victim's mother, testified that her daughter died on April 10, 1983. On cross-examination, she testified that the victim was "slightly retarded," and suffered from epilepsy. She was supposed to take Demerol, "phenobarb," and Myzelon, although at the time of the incident on June 30, 1982, she was not taking these medications. She also suffered from sickle cell anemia. She had attended special schools where she studied vocational skills, and she had worked as an Avon sales representative. The witness testified that the victim's condition had improved over the years insofar as her ability

to learn was concerned and that she was no longer considered retarded. On redirect examination, the witness stated that her daughter frequently took the bus by herself and was able to find her way to and from Hallas Industries (a workshop for the retarded and epileptic).

Albert Conroyd, a Chicago police officer, testified that he was assigned to a squadrol on June 30, 1982, and transported Bell and Gibson in the squadrol to the 9th District. They were the only prisoners in the vehicle. After the prisoners were removed, Conroyd checked the squadrol and discovered several packets of Avon products on the floor. He turned the packets over to Officer Sarabia. The squadrol had not contained the packets prior to the placement of defendants in the vehicle.

The parties stipulated that, if called to testify, James Van Tilburg, a microanalyst with the Chicago police department, would testify that he had analyzed vaginal and rectal smear samples taken from the victim and that the former sample had tested positively for the presence of semen and that the latter had tested negatively. The prosecution then rested. Both defendants moved for directed findings of acquittal, which motions were denied.

Defendants introduced a tape recording of the message read into the radio by Officers Sarabia and Van Vranken on June 30, 1982.

Levester Bell testified in his own behalf and presented an alibi defense. He stated that about midnight on June 30, 1982, he was with a friend, Marvin Hasted, Hasted's wife, and Sherman Gibson. The four went to two establishments to buy food and liquor and let Gibson out of the car about 2:10 a.m. Bell then went home. About five minutes later, Gibson appeared in Bell's upstairs room where Bell had been talking to his two cousins. The four played cards, and Bell and Gibson left to get food. They got a ride from a friend of Gibson's to a restaurant called Leon's Barbecue and arrived there at about 3:10 or 3:15 a.m. Gibson's friend left and about 37 minutes later, they picked up their food and left. They stopped at a bench in a park at 57th and Racine and began to eat. Because the bag that their food had been wrapped in was excessively greasy, they looked for another bag to put around the food. They found a blue bag on a bench and put the brown bag containing their food in the blue bag. They began walking toward 55th and Halsted to catch a bus when they saw a car drive into a tree in the park. As they walked over to look at the crash, they saw two police officers in a squad car who had two men in handcuffs outside the car and a woman inside the car. The officers called to Bell and Gibson and informed them that they were under arrest. The witness

described the men in handcuffs as "dark-skinned, about my complexion, my height, and everything," and stated that they were wearing dark clothing. The officers took the handcuffs off the two men and handcuffed defendants. The witness denied ever having any Avon products and denied raping and sodomizing the victim. Sherman Gibson testified on his own behalf and corroborated Bell's statements.

It was stipulated that if called to testify, Dr. Christina Orfei would testify that she is a medical doctor who was treating the victim in June and July of 1982 for a seizure disorder; that the victim was to take 100 milligrams of Dilantin twice a day and 250 milligrams of Depakene to prevent seizures; that the failure to take the medicines would make her more vulnerable to seizures, but would not induce them; and that in her opinion the victim did not suffer a seizure at the time of the assault because the hospital records indicated that she was alert shortly after the attack.

The parties also stipulated that if called to testify, Dr. Herman, a psychologist employed by the University of Illinois Hospital, would testify that the victim's scores on the Wechsler Adult Intelligence Scale were as follows: verbal I.Q. of 72, performance I.Q. of 83, and full scale I.Q. of 76; that because the verbal part of the test contains a cultural and socio-economic bias, blacks, Hispanics, and poor people generally do poorly on that section of the test; that the performance I.Q. is the best indicator of the victim's actual intelligence and that an 83 would place her in the dull-normal range; and that repeated testing would tend to inflate the scores.

Annette Lee testified on behalf of the defense. She stated that she was related to both defendants. On June 30, 1982, at about midnight, she was at her home playing cards with defendants. The two defendants left about 3 a.m.

Valerie Bell testified on behalf of the defense. She is also related to both defendants. On June 30, 1982, both defendants arrived at her house, but she could not remember what time. They played cards for about half an hour and defendants left at about 3:30 a.m.

Both defendants rested and moved to strike the preliminary hearing testimony, which motions were denied. After hearing closing arguments, the court found both defendants guilty of rape, deviate sexual assault (anal intercourse), robbery, unlawful restraint, and attempted deviate sexual assault (oral sex). Judgment was entered on the findings and sentences imposed. Defendants appeal.

OPINION

Defendants' first contention on appeal is that the trial court vio-

lated their right to confrontation in admitting into evidence the preliminary hearing testimony of the complaining witness and that the cross-examination was unduly restricted in scope and nature. The State responds that the defendants' confrontation rights were not violated because the deceased victim had testified under oath and was face-to-face with defendants at the preliminary hearing before a judicial tribunal at which defense counsel conducted a probing cross-examination of the victim's ability to recall the events of the previous evening.

"[P]revious testimony of a witness who dies pending trial is admissible at that trial if an adequate opportunity for cross-examination was present when the testimony was originally given." (*People v. Tennant* (1976), 65 Ill. 2d 401, 410, 358 N.E.2d 1116, 1120.) "Adequate opportunity to cross-examine means an opportunity to effectively cross-examine, and merely providing an opportunity to cross-examine at the preliminary hearing is not *per se* [an] adequate opportunity." (*People v. Horton* (1976), 65 Ill. 2d 413, 417, 358 N.E.2d 1121, 1124.) Since the trial herein, section 115—12 has been added to the Code of Criminal Procedure of 1963, effective January 1, 1984, which provides:

> "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." (Ill. Rev. Stat. 1983, ch. 38, par. 115—12.)

In the instant case, defense counsel cross-examined the witness at the preliminary hearing and was allowed to inquire extensively into the lighting conditions at the scene of the crime, the victim's opportunity to observe her attackers, and the victim's efforts to resist and cry out. The victim denied that she had identified any other persons as her attackers. She further testified under cross-examination that when they were walking to the school park she had been staring at them because she was afraid. She also said that she could see their faces because of the lights around the park. In addition, she was with them in the park for over an hour. The trial court sustained the prosecutor's objections to a defense inquiry concerning the attackers' clothing.

The question whether ample opportunity to cross-examine was afforded at the preliminary hearing does not lend itself to a *per se* analysis and must be decided on a case-by-case basis. (*People v. Horton* (1976), 65 Ill. 2d 413, 416, 358 N.E.2d 1121.) In the instant

case, it does not appear that the opportunity for cross-examination was unduly restricted. Defense counsel was allowed to cross-examine the witness concerning her ability and opportunity to observe her attackers, whether she had identified any other persons as her assailants, as well as her own testimony concerning the specific elements of the crimes charged. Foreclosure of inquiry into the attackers' attire, in light of the victim's positive identification of both defendants, does not, in our view, mean that defendants were denied ample opportunity for cross-examination. (*Cf. People v. Chism* (1978), 65 Ill. App. 3d 33, 37-38, 382 N.E.2d 377.) The inability to pursue this line of inquiry, and the possibility that some inconsistencies in the witness' description of the offenders' clothing would be adduced, affect the weight to be given that testimony rather than its admissibility. (See *People v. Chism* (1978), 65 Ill. App. 3d 33, 37-38, 382 N.E.2d 377; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 616-17, 378 N.E.2d 1318; *People v. Sanford* (1975), 34 Ill. App. 3d 485, 488-89, 340 N.E.2d 255.) Where the victim has the opportunity to observe and afterwards makes a positive identification, the sufficiency of the recognition becomes a question of fact for the trial court. (*People v. Ervine* (1965), 64 Ill. App. 2d 82, 87-88, 212 N.E.2d 346.) This standard was met in the instant case, inasmuch as the victim testified that she was with defendants in lighted areas for over an hour, that she had stared at their faces, and that she had identified them to the police. Defendants were afforded the opportunity to cross-examine as to these crucial elements. We conclude that the trial court's ruling did not constitute a significant limitation on defendants' right to cross-examination.

■ Defendants also assert that the trial court's refusal to allow them to further explore the victim's education and disabilities constitutes error. Defendants have not argued that this subject of inquiry was relevant to any issue other than the witness' competency, and they have not challenged the trial court's determination of that issue. As this court has recently held, a witness who is mentally retarded is legally competent to testify so long as the witness has the capacity to observe, recollect, and communicate. (*People v. Spencer* (1983), 119 Ill. App. 3d 971, 977, 457 N.E.2d 473.) In *Spencer* the witness was a mild-to-moderate retarded adult who could not talk or use a standard sign language but who could understand questions and could respond best to leading questions. On that basis she was held competent to testify. In the instant case, the witness could not only speak but also responded effectively and, as the trial court noted, with consistent recall to leading questions. Defendants' inability to delve into the witness' competency at the preliminary hearing did not result in any

prejudice to them, especially in light of the fact that they were afforded a full and complete opportunity to litigate the issue of competency at the hearing on the motions concerning the admissibility of the transcript of the preliminary hearing testimony. The matter was further explored at trial when Dorthea Parker, the victim's mother, testified to her daughter's condition. We conclude that under these circumstances, the foreclosure of inquiry at the preliminary hearing did not constitute a denial of a meaningful opportunity to cross-examine the witness. It follows therefrom that the admission of the preliminary hearing testimony was not error. See *People v. Tennant* (1976), 65 Ill. 2d 401, 410, 358 N.E.2d 1116.

■ Defendants next contend that the trial court erred in allowing the arresting officer to testify to an out-of-court identification made by the victim where that witness did not testify to the identification. The prosecution responds initially that this issue was waived by the failure to object either at trial or in the post-trial motion. (See generally *People v. Caballero* (1984), 102 Ill. 2d 23, 31, 464 N.E.2d 223.) This court, of course, is empowered to consider alleged errors which may have deprived the accused of substantial means of enjoying a fair and impartial trial. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282-83, 296 N.E.2d 856; 87 Ill. 2d R. 615(a).) Analyzing the merits of defendants' contention, it appears that there was no error in the admission of the officer's testimony. The general rule is that before a third person may testify to a witness' out-of-court identification of an accused, the witness must first testify to the identification. (*People v. Rogers* (1980), 81 Ill. 2d 571, 579, 411 N.E.2d 223.) In the instant case, the victim testified in her preliminary hearing testimony that she had pointed out both defendants, and no one else, to the police. When introduced at trial, this testimony is a sufficient foundation for the police officer's corroborative testimony. *People v. Marshall* (1977), 47 Ill. App. 3d 784, 788, 365 N.E.2d 367.

For all of the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

SULLIVAN, J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. The defendants, Sherman Gibson and Levester Bell, were capriciously and insensibly denied an adequate opportunity to cross-examine the victim at the preliminary hearing. In addition, the

admission of the victim's preliminary hearing testimony as substantive evidence against the defendants at their trial was a flagrant violation of the defendants' constitutional right to be confronted with and to cross-examine the witness against them.

In *Greene v. McElroy* (1959), 360 U.S. 474, 496, 3 L. Ed. 2d 1377, 1390-91, 79 S. Ct. 1400, 1413, the Supreme Court emphasized the immeasurable worth of confrontation and cross-examination as follows:

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. *We have formalized these protections in the requirements of confrontation and cross-examination.*" (Emphasis added.)

Article 1, section 8, of the Illinois Constitution provides that, "In criminal prosecutions, the accused shall have the right *** to meet the witnesses face to face ***." The sixth amendment to the Constitution of the United States provides, "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." In *Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065, the robbery victim testified at the defendant's preliminary hearing. The defendant did not have a lawyer and the victim was not cross-examined. The victim had moved to another State when the defendant came to trial. Over the defendant's objection that it violated his constitutional right of confrontation, the victim's preliminary hearing testimony was admitted as evidence against the defendant. He was convicted. The Supreme Court held:

"We hold today that the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment.

* * *

[C]ertainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case. ***. *The fact that this right appears in the Sixth Amendment of our Bill*

*of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair trial in a criminal prosecution.* Moreover, the decisions of this Court and other courts [footnote omitted] throughout the years have constantly emphasized the necessity for cross-examination as a protection for defendants in criminal cases. This court in *Kirby v. United States*, 174 U.S. 47, 55, 56, referred to the right of confrontation as '[o]ne of the fundamental guarantees of life and liberty,' and 'a right long deemed so essential for the due protection of life and liberty that it is guarded against legislative and judicial action by provisions in the Constitution of the United States and in the constitutions of most if not all of the States composing the Union.' [T]he right of cross-examination is 'one of the safeguards essential to a fair trial.' And in speaking of confrontation and cross-examination this Court said in *Greene v. McElroy*, 360 U.S. 474:

> 'They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right "to be confronted with the witnesses against him." *This Court has been zealous to protect these rights from erosion.*' [Citation.] (Footnote omitted.)

There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, *we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.*" (Emphasis added.) 380 U.S. 400, 403-05, 13 L. Ed. 2d 923, 926-27, 85 S. Ct. 1065, 1068.

In *Douglas v. Alabama* (1965), 380 U.S. 415, 13 L. Ed. 2d 934, 85 S. Ct. 1074, the prosecutor called the defendant's convicted accomplice as a State witness at the defendant's trial and cross-examined him as a hostile witness. Despite the accomplice's persistent refusal to answer, the prosecutor read the accomplice's confession which implicated the defendant. The Supreme Court held that the defendant's inability to cross-examine the accomplice about his purported confession denied the defendant the right of cross-examination, which right is secured by the confrontation clause of the sixth amendment to the Constitution of the United States. The court further held the sixth amendment right of confrontation and cross-examination is made

binding on the States by the due process clause of the fourteenth amendment to the Constitution of the United States. 380 U.S. 415, 418-20, 13 L. Ed. 2d 934, 937-38, 85 S. Ct. 1074, 1076-77.

In *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, a State law protected the anonymity of juvenile offenders. Based on this statute, the trial judge refused to allow defense counsel to question a key prosecution juvenile witness concerning a burglary and his probation status at the time of the events to which he testified. The defendant was convicted of burglary and larceny. The Supreme Court granted *certiorari* "limited to the question of whether petitioner was denied his right under the Confrontation Clause to *adequately cross-examine*" the juvenile. (Emphasis added.) (415 U.S. 308, 315, 39 L. Ed. 2d 347, 352, 94 S. Ct. 1105, 1110.) In reversing the convictions, the court held:

> "The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas*, 380 U.S. 400 (1965).
>
> * * *
>
> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. *** A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' ***. We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.
>
> * * *
>
> [D]efense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which ' "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." ' " (Emphasis added.) 415 U.S. 308, 315-16, 318, 39 L. Ed. 2d 347, 353-54, 355, 94 S. Ct. 1105, 1110-11.

The Illinois Supreme Court relied on the adequacy of the opportunity to cross-examine in affirming the defendant's conviction in *People v. Tennant* (1976), 65 Ill. 2d 401, 358 N.E.2d 1116. In *Tennant*, the defendant was charged in a complaint for preliminary examination with murder, to which he confessed. Willa Watson was a co-occupant of the rooming house with the defendant, the deceased and others. At the preliminary hearing, Watson testified to various facts which circumstantially implicated the defendant in the homicide. Watson died before trial. At the defendant's trial, Watson's preliminary hearing testimony was admitted against the defendant, as were his confession and other incriminating evidence. In affirming the defendant's conviction, the supreme court held:

"Watson had testified for the State [*at the preliminary hearing*] *and had been cross-examined by counsel for defendant without limitation.*

\* \* \*

[P]revious testimony of a witness who dies pending trial is admissible at that trial *if an adequate opportunity for cross-examination was present when the testimony was originally given.*

\* \* \*

We accordingly hold that where, as here, *there was an adequate opportunity for cross-examination of the preliminary hearing testimony of a witness* who dies prior to trial, the earlier testimony of that witness is properly admitted at trial." (Emphasis added.) 65 Ill. 2d 401, 404, 410-11.

At the preliminary hearing of the case at bar, counsel for the defendant was prohibited from cross-examining the victim *without limitation* by frivolous objections of the prosecuting attorney and improper rulings by the preliminary hearing judge. Moreover, as hereafter pointed out, because of the facts of the case and the logistical posture of the preliminary hearing witnesses and the trial witnesses, the defendants were clearly denied an adequate opportunity to cross-examine the victim on crucial issues of the case at the preliminary hearing.

It was stated in *People v. Horton* (1977), 65 Ill. 2d 413, 358 N.E.2d 1121, that whether a defendant had an adequate opportunity to cross-examine a preliminary hearing witness for purposes of using that testimony at trial because of the unavailability of the witness must be decided on the facts and determined by "the circumstances in each case." In *Horton*, the defendants robbed a tavern owner, who testified and was extensively cross-examined at the preliminary hearing, but who died before trial. The tavern owner's preliminary hear-

ing testimony was admitted against the defendants at trial. The supreme court held:

> "[T]he question whether 'ample opportunity to cross-examine' was in fact presented at the preliminary hearing does not lend itself to a *per se* determination and must be decided upon the circumstances in each case.
>
> 'A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial.' \*\*\*. The provision in article 1, section 7, of the Illinois Constitution for 'a prompt preliminary hearing to establish probable cause' shows clearly that its purpose is so limited.
>
> Ordinarily, cross-examination at a preliminary hearing is subject to the general rule that it may not extend beyond the scope of the direct examination and such further interrogation as is directed to show interest, bias, prejudice or motive of the witness to the extent that these factors are relevant to the question of probable cause. \*\*\* [C]learly the preliminary hearing is not intended to be a discovery proceeding. In the absence of discovery procedures and in view of the limited nature of the evidence which may be introduced at a preliminary hearing, *the question whether adequate opportunity to cross-examine had existed at the preliminary hearing \*\*\* may not depend in its entirety on what transpired at that hearing. Adequate opportunity to cross-examine means an opportunity to effectively cross-examine, and merely providing an opportunity to cross-examine at the preliminary hearing is not per se adequate opportunity.*" (Emphasis added.) 65 Ill. 2d 413, 416-17.

The supreme court further held in *Horton* that the preliminary hearing testimony of the robbery victim revealed that there was nothing therein which was not covered by the testimony of the other trial witness, that additional cross-examination would not have benefited the defendants, and that the defendants were afforded an adequate opportunity to cross-examine the robbery victim at the preliminary hearing.

In the case at bar, there was testimony of trial witnesses about which the victim could only have been cross-examined at the trial—not at the preliminary hearing. Additional cross-examination of the victim, had it been allowed, would have obviously benefited the defendants. Instead, defendants were denied an adequate opportunity to cross-examine the victim at the preliminary hearing.

It was the State's contention at trial that during the early morning hours of June 30, 1983, the victim was raped by two men in a park on the south side of the city of Chicago. The victim was 24 years old. Her mother testified that she was "slightly retarded" and that she suffered from epilepsy and sickle-cell anemia. Her mother testified further that Demerol, phenobarbital and Mysoline were the victim's prescribed medication, but that the victim was not taking her medication at the time of the incidents in the instant case. Further comment will be hereafter made regarding the victim's mentality, illness and medications.

The victim "did not really know" where or on what street the park in which the incident occurred was located. She could "not really" read. She understood "only little words like dog, cat and things like that," and she could not read a street sign. At some time after her assailants fled, the victim encountered Chicago police officers Frank Sarabia and William Van Vranken, who were driving a marked squad car southbound on Union Street at approximately 53rd Street at about 3:20 a.m. Even though the victim did not know and was unable to tell the location of the park in which the incident occurred, Officer Sarabia, nevertheless, testified that the victim told him and his partner when she encountered them that the incident occurred in a park "at 52nd and Lowe."

Officer Sarabia testified further that the victim described one of her assailants to him as *"a tall black man, dark complexion with a maroon jacket, gray slacks and a hair net"* and *"medium build."* Sarabia also stated, "We gathered he was *over six feet* from the description in relation to my partner's height." (Emphasis added.) Sarabia testified that the victim described her other assailant as *"a black male, dark complected,* approximately *five-eight or five-nine, heavy build, wearing a black jacket,"* which the victim said was neat looking, and *"Levis—blue jeans."* (Emphasis added.)

Sarabia said that he "immediately put out a flash message over the radio to the other cars in the vicinity." He stated that to the best of his recollection, the descriptions of the assailants that he gave in his flash message were the previously stated description. On cross-examination, however, Sarabia conversely testified that the flash message merely described the offenders as *two black males, one wearing a black suit coat and one wearing a longish jacket,* and that there was no mention in the flash message or in his police report of the age, height, build or complexion of each offender, or of a hairnet, a blue bag or Avon products. Officer Sarabia testified on cross-examination:

"Q. Officer, I am going to show you what is marked Defendant's Exhibit No. 2 for identification. That is the case report you prepared in this incident, is that right?

A. Yes.

* * *

Q. You told us earlier you made a call into the radio with the description of the two men and what they had [taken] from the woman, is that right?

A. That's right.

Q. I am going to direct your attention to the last paragraph or last sentence of Paragraph 1 on page 2 of your police report *** the last four lines [read], 'reporting officer obtained a description of the two offenders and sent a flash message via zone 13.' Does that say that?

A. Yes.

Q. It also says that message of two male blacks, one wearing a black suit coat and one wearing a longish jacket does it say that?

A. Yes.

Q. Does it contain any information—is that the entire information it contains about the dispatch?

A. In the report?

Q. Yes.

A. Yes.

Q. It doesn't contain any information about age?

A. No.

Q. It doesn't contain any information about height?

A. No.

Q. It doesn't contain any information about complexion?

A. Right.

Q. It doesn't contain information about their builds?

A. No.

Q. It doesn't say anything about one of the men being over six feet tall?

A. That's right.

Q. It doesn't say anything about the man wearing a hair net?

A. No, it doesn't.

Q. It doesn't say anything about the man carrying a blue bag?

A. No.

Q. It doesn't say anything about the men having Avon prod-

ucts in their possession?

A. No, it doesn't."

It was stipulated that the 911 flash message tape recording was "an accurate depiction of the 911 message read into the radio by Officers Van Vranken and Sarabia pertaining to the rape incident of 30 June 1982." The flash message recording was played in open court as a part of the defense evidence. Although the recording was not transcribed by the court reporter and was not made a part of the record on appeal, the record reveals that the trial judge heard the flash message recording a second time and that the attorneys commented on the tape to the trial judge as follows:

"MR. KLOAK [attorney for Bell]: Judge, one of the issues in this case is the identification of the attackers. *** Officer Sarabia *** told you that approximately at 3:20 in the morning on the 30th of June 1982, he met a girl who was screaming and hollering that she had just been raped by two black men. ***. [S]he gave him a description of the two men that had done these things to her. ***. He also told us that [the victim] said that the men that had done this to her had taken her blue bag and Avon products.

Your Honor, you heard the 911 tapes before, and I would ask you to listen to that tape again. It's a contemporaneous statement, and it's a relaying by Officer Sarabia of what actually he was told. Officer Sarabia was told these things by someone that had just been attacked and had been told these things about some people that hadn't been caught. He certainly would have put all these details and all these items into the dispatch tape which he admitted he made. So I would ask the court to once again listen to the dispatch tape of Officer Sarabia."

The tape was again played in open court, but not transcribed by the court reporter. Assistant Public Defender Kloak thereafter commented:

"You heard from the tape, your Honor, that someone asked Officer Sarabia for a description. He said, 'We don't have a description. We're trying to calm her down.' This was approximately at 3:43. ***. It was approximately 23 minutes after Officer Sarabia says he sees [the victim] on 52nd and Union, 'I'm still not able to get a description.'

\* \* \*

In his report it's got down, '*Number one man has a neat black jacket.*' and then his report also contains, '*The second man had a brownish jacket,*' which is different from his testi-

mony or his statement on the 911 [flash message] tape. And you can remember when he wrote the report, Levester Bell [was] arrested. [Sarabia had seen] Levester Bell's jacket and he might have wrote that down in his police report if it was a brown jacket. *In the 911 [flash message] it was 'neat black suit or black jacket, and the second man was wearing a black jacket with brown pants.'* \*\*\*. *Levester Bell had a maroon jacket with gray pants.* It's much different than a black jacket with brown pants.

\* \* \*

I think when you listen to the 911 [flash message] tape and you see that there's no description of a blue bag, or Avon products taken, and when you see that they stopped these two men a block away, and these people didn't appear to have any blue bag, it goes to show that Officer Sarabia wasn't told anything about the blue bag and the Avon products before they arrested Sherman Gibson and Levester.

The 911 tape tells you that 3:43 in the morning [the victim] still hadn't composed herself, still wasn't able to give a description, still was hysterical \*\*\*. But Officer Sarabia would have you believe at 3:20 in the morning she had composed herself and was able to give a description.

\* \* \*

Judge, the absence of a description, which you've heard from the 911 tape, the suspicious nature in which the Avon products were found \*\*\*." (Emphasis added.)

Rosario Cibella, the attorney for the defendant Sherman Gibson, then commented to the court on the 911 flash message tape:

"Officer Sarabia wasn't totally candid on the stand. He told you that he put out a complete description of the height, weight, the build, the complexion of these two offenders over the 911 [flash message] tape. You heard the tape. There was a description of a neat black suit and a brown jacket, and that was the description that went over the 911 tape. \*\*\*. It doesn't contain all the specifics that Officer Sarabia got on the stand and told you that he put in his [police report].

\* \* \*

[Y]ou heard the tape. There was one description, an inaccurate description not even close to what the defendants that they picked up, Mr. Bell and Mr. Gibson, in this case, what they were wearing."

In Assistant State's Attorney Arthur Neville's comments to the

court about Officer Sarabia's 911 flash message tape, Neville was compelled to admit and concede that Officer Sarabia did not give the detailed descriptions of the offenders in his 911 flash message that he testified at trial he gave. Neville had no choice but to concede. The tape spoke for itself. Assistant State's Attorney Neville commented:

"The 911 tape serves as one purpose. In this case, your Honor, the 911 tape was brought in directly for impeachment purposes. It is not substantive evidence. It is brought in to show this court that Officer Sarabia was putting out any type of description for purposes of later coming to court so he could be ripped to shreads [sic] with it. Officer Sarabia puts out a flash message for one purpose, and that is to apprehend the two offenders that committed this crime. It does not give a detailed description of each offender ***. The flash message given over the air by Officer Sarabia is so that police officers can have a general description of the offenders involved and then apprehend them ***. The flash message given by Officer Sarabia was not meant to be the total end all, be all description of the offenders. Rather, it is given so the police can act quickly and act responsibly ***. You hear Officer Sarabia calling in that he has a possible rape suspect. They ask him for a description. He says, no, I have to calm her down. ***. He says *** 'I'm going to put out part of a description.' "

After putting in a 911 flash radio description of the offenders, whether as detailed as Sarabia testified they were at the trial, or whether as meager as the 911 flash message revealed, Officers Sarabia and Van Vranken toured the area with the victim in their police car, according to Sarabia's trial testimony. They spotted two suspects, stopped and searched them after the victim had told them that they were not the offenders. The physical and wearing apparel descriptions of these two persons are not revealed in the record, nor is there any explanation in the record as to why Sarabia stopped and searched them if Sarabia had obtained such a detailed description of the assailants from the victim and if such detailed description was radioed as a flash message, as he testified. It is quite apparent, however, why he stopped and searched the two individuals even though, as his meagerly descriptive flash message revealed, he had not obtained a detailed description of the assailants.

After releasing the first two suspects, Sarabia, Van Vranken and the victim resumed their tour of the area. They came upon and arrested the defendants, who the victim stated were her assailants. The defendants were taken into the police station and processed. Both

defendants denied commission of the offenses.

The Supreme Court stated in *Pointer v. Texas* (1965), 380 U.S. 400, 404, 13 L. Ed. 2d 923, 926, 85 S. Ct. 1065, 1068, "[N]o one experienced in the trial of law suits would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case." It is equally true that experienced prosecutors, defense attorneys, and trial judges would not deny that the most difficult criminally accused defendant to successfully defend, however innocent he may be, is the defendant who is arrested (1) in the vicinity of the commission of the offense, (2) shortly after the commission of the offense, (3) upon ostensibly being identified by the victim to the arresting officers touring the area to apprehend the offender, (4) *before* any official police reports are prepared of the victim's report of the offense, or of the description of the offender or of any police investigation, and (5) where all police reports of the commission of the offense, the description and wearing apparel of the offender, and the apprehension of the offender are prepared *after* the alleged offender has been arrested. No case offers a greater challenge to the integrity or the accuracy of the fact-finding process. Such a case reeks with opportunities to fabricate and to officially document such fabrication. More importantly, it precludes exposure of such documented fabrication by the most skillful, artful and experienced cross-examiner.

In the case at bar, the defendants were aided in their defense only by the astute preservation of the 911 flash message tape. Because of the death of the victim, however, the defendants were denied their constitutional right to cross-examine the victim at their trial about the descriptions that she gave of her assailants to Officer Sarabia. It is patently apparent from the foregoing 911 flash message tape colloquy that the description of the assailants and cross-examination of the victim thereon were vital to the defendants' defense. It should be noted that Van Vranken was not called as a witness by the prosecution. The opportunity to cross-examine Sarabia, but not the victim, on this crucial issue did not redress denial of the defendants' right of confrontation and cross-examination of the victim. As the Supreme Court stated in *Douglas v. Alabama* (1965), 380 U.S. 415, 419-20, 13 L. Ed. 2d 934, 938, 85 S. Ct. 1074, 1077, "[T]he opportunity to cross-examine *the law enforcement officers* [was not] adequate to redress this denial of the essential right secured by the Confrontation Clause" to cross-examine *the codefendant*, who on fifth amendment grounds, refused to testify.

When Sarabia and Van Vranken processed the defendants in the police station, they prepared all their police reports of the victim's ini-

tial complaint to them, of their tour of the area and of the defendants' arrest. Sarabia and Van Vranken probably could not accurately determine to what extent they were influenced by pre-arrest information as opposed to post-arrest information in the preparation of the police reports. It would require superhuman efforts by Sarabia and Van Vranken to accurately separate information that they acquired *before* the defendants' arrest from information which they acquired upon and *after* the defendants' arrest, particularly regarding the defendants' physical descriptions and wearing apparel.

The morning following the defendants' arrest, on July 1, 1982, the defendants appeared before the court on complaints for preliminary examination which charged them with the commission of various offenses upon the victim. Both defendants advised the court of their indigency and a public defender was appointed to represent them. Thereupon, the court ordered the case "pass[ed] for a preliminary hearing *** in a few minutes." When the case was recalled, the public defender made a motion for discovery, which was denied. In *People v. Horton* (1976), 65 Ill. 2d 413, 417, 358 N.E.2d 1121, the supreme court held that a preliminary hearing was not intended to be a discovery proceeding, since Supreme Court Rule 411 provides that discovery rules in criminal cases are applicable only after indictment or information and shall not be operative prior to or in the course of a preliminary hearing. The defendants' attorney, appointed only moments previously, was thus compelled to represent the defendants at the preliminary hearing with no preparatory information or discovery material.

The victim was the only witness called by the prosecution at the preliminary hearing.[1] The assistant State's Attorney, on his direct examination, put into evidence the bare necessity to establish probable cause. He was well aware that "[a] preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial." *People v. Horton* (1976), 65 Ill. 2d 413, 416, 358 N.E.2d 1121.

The victim, in essence, simply testified on direct examination that she was accosted on the street by two men, who took her to a park and had vaginal and anal intercourse with her against her will and took her property. She identified the two defendants in court as her assailants.

---

[1]Excerpts of the victim's preliminary hearing testimony are set forth in the appendix.

By effectively limiting the victim's direct examination, the prosecutor successfully confined cross-examination of the victim by the defendants' attorney to the scope of the victim's deliberately restricted direct examination. The victim was not asked a single question and did not testify on direct examination about her encounter with Sarabia and Van Vranken, her tour with them to seek her assailants, her identification of the defendants to Sarabia and Van Vranken as her assailants, or Sarabia and Van Vranken's arrest of the defendants.

In the absence of clairvoyant powers, the defendants' attorney at the preliminary hearing would have no way of knowing that Sarabia would subsequently testify at trial as to the detailed physical description and wearing apparel of the assailants that the victim allegedly gave the police officers when she reported the incident to them. The victim's description to the officers of the offenders became an extremely crucial issue at the defendants' trial. The defendants were denied an adequate opportunity to cross-examine the victim, however, on these crucial identification issues. In fact, after the victim testified at the preliminary hearing that she stared at her assailants and that she was in the park with them "about two hours," the following colloquy ensued:

"Q. What were the men wearing?

MR. LOEB [assistant State's Attorney]: Objection.

THE COURT: Sustained."

This inquiry was most appropriate. On what basis the assistant State's Attorney objected to the question defies a legal explanation. On what basis the court sustained the objection is equally unclear.

The majority's disdainful resolution of this issue is inept. The majority holds that "[f]oreclosure of inquiry into the attackers' attire, in light of the victim's positive identification of both defendants, does not in our view, mean that defendants were denied ample opportunity for cross-examination." First, if inquiry of the victim about her attackers' attire had been allowed, her responses might very well have revealed that her identification was not so "positive." Second, in cases where identification is the crucial issue, if "[f]oreclosure of inquiry into the attackers' attire *** does not *** mean that defendants were denied ample opportunity for cross-examination," it is impossible to perceive what else, if anything, it does mean.

The majority further holds that "[t]he inability to pursue this line of inquiry, and the possibility that some inconsistencies in the witness' description of the offenders' clothing would be adduced, affect the weight to be given that testimony rather than its admissibility." The

right to cross-examine a victim about the wearing apparel of her attacker in an effort to challenge the accuracy of the victim's identification of a defendant who has been so identified, *is a constitutional right*. It is not an issue on the *weight* or the *admissibility* of evidence, as the majority states.

The majority's reliance on *People v. Chism* (1978), 65 Ill. App. 3d 33, 382 N.E.2d 377, is misplaced. In *Chism*, Larry Pettis was robbed by three people, two of whom had guns and whom Pettis later identified as Chism and Fiske. Pettis hailed a police car. When the police spotted the robbery offenders in Pettis' friend's Buick the offenders fled in the car and a police chase ensued. The Buick crashed into another vehicle, killing the occupants. Pettis identified Chism and Fiske, who were pinned in the wrecked Buick, as his assailants. At the preliminary hearing, Pettis testified fully and was not restricted on cross-examination. Because Pettis died before trial, however, his preliminary hearing testimony was admitted at the trial.

The majority's reliance on *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318, *People v. Sanford* (1975), 34 Ill. App. 3d 485, 340 N.E.2d 255, and *People v. Ervine* (1965), 64 Ill. App. 2d 82, 212 N.E.2d 346, is also misplaced. Neither case involved the admission of preliminary hearing testimony at a defendant's trial. Neither case presented a confrontation, cross-examination issue. Rather, each case presented simply an identification issue.

In the case at bar, it can be reasonably inferred that at the preliminary hearing, the defendants' attorney detected from the victim's demeanor and her testimony that she suffered from some form of intellectual deficiency. She testified that she could not read street signs, that she did not know the location of the park where the incident occurred, and that she understood only little words like dog and cat. After this testimony, the defendants' further inquiry was unjustifiably curtailed in the following manner:

"Q. [Victim], did you go to school?
MR. LOEB [assistant State's Attorney]: Objection.
THE COURT: Sustained.
MR. MARTIN [assistant Public Defender]: [Victim], were you in any special classes when you were in school?
MR. LOEB: Objection.
THE COURT: Sustained."

It is quite apparent that this line of inquiry was relevant to the witness' competency. This inquiry was unconstitutionally curtailed.

Evidence was later presented at the trial that the victim was mentally retarded and had brain damage, was "educable mentally

handicapped," had a borderline I.Q. of 76, and that she had a history of epileptic seizures and sickle-cell anemia. In November 1982 she was six months' pregnant and in her fourth pregnancy. In June and July 1982 she was prescribed extensive medication for her seizure disorders.

The victim's mother testified that on the day of the incident, the victim did not take her medication that was prescribed to be taken three times a day. The mother testified further that her daughter attended special education classes of reading and basic arithmetic. She said that she last gave her daughter her medication on June 28, 1982. The mother testified further that on one occasion when she brought the victim to court, the victim was unable to testify because "she was not feeling good and she wasn't coordinating well. [S]he had took [sic] her medication. She was drowsy which occurs sometimes." The record reveals that the victim died on April 10, 1983, and that the cause of death was "chronic seizure disorder."

From the foregoing facts, a bona fide question of the victim's competency as a witness may be raised. Although the defendants' attorney did not have the benefit of all of the previously mentioned information at the preliminary hearing, nevertheless, his efforts to justifiably inquire about whether the victim attended school or special classes in school were improperly restricted.

The victim's demise was unexpected and indeed unfortunate. Horrible crimes were perpetrated upon her. But these tragedies are no justification for relaxing constitutional rights and safeguards in order to bring the alleged offenders to justice. I express no opinion on whether the evidence established the defendants' guilt beyond a reasonable doubt. Whether guilty or innocent, however, they had the constitutional right to challenge the competency of this witness. That constitutional right of confrontation and cross-examination was denied these defendants at their preliminary hearing and again at trial by the admission of the victim's preliminary hearing testimony as substantive evidence.

The majority's resolution of this grave constitutional issue is unsatisfactory. The majority mistakenly states that the defendants did not challenge the trial court's determination that the victim was competent. But the defendants did challenge the victim's competency when they argued, albeit unsuccessfully, against admission of the victim's preliminary hearing testimony at their trial. They could not have challenged her competency at the preliminary hearing, because they did not then know about it. Had the trial judge allowed the defendants' inquiry regarding the victim's education, which the

trial judge should have done, the victim's answers might very well have triggered further inquiry and further indication of her incompetency.

For the majority to conclude that "[d]efendants' inability to delve into the witness' competency at the preliminary hearing did not result in any prejudice to them" begs the question. First, had the defendants been allowed "to delve into the witness' competency at the preliminary hearing," they may have been able to establish that the witness was incompetent. Second, it is not a question of what the defendants could establish on cross-examination, rather, it is their *right* to attempt to establish it on cross-examination. Third, as the Supreme Court stated in *Davis v. Alaska* (1974), 415 U.S. 308, 318, 39 L. Ed. 2d 347, 355, 94 S. Ct. 1105, 1111, "Petitioner was thus denied the right of effective cross-examination which 'would be constitutional error of the first magnitude and *no amount of showing of want of prejudice would cure it.*' " (Emphasis added.)

The majority further fallaciously reasons that the defendants "were afforded a full and complete opportunity to litigate the issue of competency at the hearing on the motions concerning the admissibility of the transcript of the preliminary hearing testimony." First, it is a physical impossibility to afford "a full and complete opportunity to litigate the issue of competency" of a deceased person. Second, the motion was for admission of the victim's preliminary hearing testimony; it was not a hearing on the competency of the victim. Third, cross-examination of the victim's mother, nurse or doctor on the victim's competency was not an adequate substitute for cross-examination of the victim. See *Douglas v. Alabama* (1965), 380 U.S. 415, 419-20, 13 L. Ed. 2d 934, 937-38, 85 S. Ct. 1074, 1077.

In conclusion, although it may be desirably expedient to affirm the instant convictions, desirable expediency is no justification for relaxing treasured constitutional safeguards. The defendants' convictions should therefore be reversed.

To obtain guilty findings in the case at bar, it was essential that the State prove beyond a reasonable doubt that these defendants were the victim's assailants. The defendants had the absolute right to challenge the accuracy of the victim's identification of them as her assailants. Both defendants denied commission of the offenses, and both defendants asserted that the victim was mistaken in her identifications. Because the preliminary hearing judge improperly sustained frivolous prosecutorial objections to the defense attorneys' inquiry, the defendants were unconstitutionally restricted in their preliminary hearing cross-examination on the authenticity of the victim's identifi-

cation.

It is indeed noteworthy that had the victim testified *at trial* and had the defense attorney asked her the questions about the lighting conditions at the scenes of her attacks and the descriptions of her assailants' wearing apparel (which he asked her at the preliminary hearing), and had an assistant State's Attorney imposed such ludicrous objections to such questions at a trial (which he did at the preliminary hearing), and had a trial judge sustained such objections at a trial (as did Judge Joseph J. Urso, the preliminary hearing judge), is there any court of review that would not hold that the defendants had been denied their constitutional right to cross-examination and to a *fair trial*, necessitating reversal? (*Davis v. Alaska* (1973), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.) If a trial court's erroneous rulings at a trial, which improperly excluded evidence on the material issue of the correctness of an offender's identification, would result in reversal, should any less be required when the same is accomplished at trial through a preliminary hearing transcript? Why should the victim's untimely death so appreciably alter a defendant's constitutional right, particularly when it was the prosecutor's trivial objection which initiated the improper cross-examination restriction? By what logic does the improper denial of the constitutional right of cross-examination become instantly purified by magically filtering erroneous judicial rulings and invalid cross-examination restrictions through a preliminary hearing transcript into substantive trial evidence? The admissibility of a preliminary hearing transcript as substantive trial evidence should be more restrictive, not less, considering that when the fact finder is compelled to rely on a preliminary hearing transcript, that fact finder is denied the invaluable advantage of observing the witness. Again, the defendants' convictions should be reversed.

### APPENDIX

Excerpts of the victim's testimony at the preliminary hearing:

#### DIRECT EXAMINATION

"Q. After you said you want to go home, did they take you anywhere?

A. They took me to the school park.

Q. Is that located—

MR. MARTIN [assistant Public Defender]: Objection.

THE COURT: You may answer.

MR. LOEB [assistant State's Attorney]: Is that located at 52nd and Lowe?

A. Yes.

MR. MARTIN: Objection.

A. Yes.

THE COURT: It may stand."

CROSS-EXAMINATION

"Q. [T]his happened yesterday morning?

A. Yes.

Q. What time was it?

A. I'm not exactly sure what time it was.

Q. Well, was it early in the morning or late in the morning?

A. Early in the morning.

Q. Was it light out?

A. It was dark.

Q. It will [sic] still dark from the night before?

A. See, it was dark and they had light around the park though. I could see their faces, you see, good.

Q. Was that before the sun came up in the morning?

A. It was just dark, and the lights around the house, you know.

\* \* \*

Q. Which way were you walking on Halsted?

MR. LOEB: Objection.

THE COURT: Sustained.

A. I don't know which way.

THE COURT: Sustained.

No question pending.

\* \* \*

Q. How far away was the nearest street light?

MR. LOEB: Objection.

THE COURT: Sustained.

A. I don't—

THE COURT: Sustained.

\* \* \*

Q. Did they say anything else?

A. All I said, I want to go home.

Q. What happened after that?

A. They took me to the school park.

Q. Do you know where that school park was?

A. Not really.

Q. Do you know what street it was on?

A. I don't read that good.

Q. Can you read at all?

A. Not really.

MR. LOEB: Objection.

THE COURT: You may answer.

A. Only little words that I understand like dog, cat and things like that.

MR. MARTIN: Can you read a street sign, [victim]?

A. No.

Q. [D]id you go to school?

MR. LOEB: Objection.

THE COURT: Sustained.

MR. MARTIN: [W]ere you in any special classes when you were in school?

MR. LOEB: Objection.

THE COURT: Sustained.

MR. MARTIN: How far away was the school park from where you first saw these two men?

A. I really don't know.

* * *

Q. How long did it take you to walk to the school park?

A. I don't know, I didn't know what time it was.

Q. Well, did it take you more than five minutes to walk over there?

A. I don't know.

* * *

Q. When you were walking to the school park, did you look at either one of them?

A. Yes.

Q. Who did you look at?

A. Both of them.

Q. How long did you look at them?

MR. LOEB: Objection.

THE COURT: You may answer.

A. For a long time.

MR. MARTIN: For how long?

A. I can't hardly understand what you are saying, you know.

Q. Well, you just glimpsed at them, didn't you?

A. I was like staring at them.

Q. You stared at them?

A. Yes. Because, see, I was nervous, you know.

Q. You were afraid?

A. Yes.

Q. Did you look down at the ground?

MR. LOEB: Objection.

THE COURT: Sustained.

MR. MARTIN: Do you know how long you were in the school park?

A. No.

Q. Was it more than an hour?

A. I would say about an hour,—about two hours, I would say.

Q. What were the men wearing?

MR. LOEB: Objection.

THE COURT: Sustained.

* * *

Q. What else were you wearing?

MR. LOEB: Objection.

A. A blouse.

THE COURT: Sustained.

A. A blouse.

THE COURT: No question pending.

* * *

MR. MARTIN: There was a light on inside the building, is that right?

MR. LOEB: Objection.

THE COURT: Sustained. She has already answered that there was.

A. Yes.

MR. MARTIN: And you could see the light through the window, is that how you know?

MR. LOEB: Objection.

THE COURT: Sustained.

* * *

MR. MARTIN: You told us that one of the men put his penis in your back?

A. Yes.

Q. Did the State's Attorney tell you to use that word?

A. I wouldn't like to answer that question.

THE COURT: You have to answer it, miss.

A. Yes.

MR. MARTIN: You don't know what that means, do you?
A. Not really.

\* \* \*

Q. Which one of the men had the barbecue with him?
MR. LOEB: Objection.
THE COURT: Sustained.

\* \* \*

MR. MARTIN: Was there a car accident at this time?
MR. LOEB: Objection.
THE COURT: Do you know anything about a car accident?
A. No.
MR. MARTIN: [W]asn't there a car accident at 55th and Peoria?
MR. LOEB: Objection. Objection to the whole line of questioning.
THE COURT: Sustained.

\* \* \*

Q. [D]id these two men run out of the park?
MR. LOEB: Objection.
THE COURT: You may answer.
A. Yes.
MR. MARTIN: Did you see where they went?
MR. LOEB: Objection.
THE COURT: Sustained."